IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CV-00564-D

| | | |
|---|---|---|
| APRIL M. FISKE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the parties' cross motions for judgment on the pleadings.

Claimant, April M. Fiske, seeks judicial review of the Commissioner's denial of her application for

Social Security Disability Insurance Benefits ("DIB"). After a thorough review of the record and

consideration of the briefs submitted by counsel, it is recommended that Claimant's Motion for

Judgment on the Pleadings [DE-14] be denied and that the Commissioner's Motion for Judgment

on the Pleadings [DE-20] be granted.

## STATEMENT OF THE CASE

Claimant filed an initial application for DIB benefits on December 14, 2001. (R. 81-83.) She

alleged disability beginning July 19, 2000 due to bipolar disorder, hyperthyroidism, and Lyme

disease. (R. 87.) This application was denied initially (R. 69-73) and upon reconsideration (R. 74-

76). Claimant then requested a hearing before an Administrative Law Judge ("ALJ") (R. 77), which

took place on November 5, 2003 (R. 627). On March 11, 2004, the ALJ issued a decision denying

Claimant's application in its entirety. (R. 45-56.) The Appeals Council ("the Council") denied

Claimant's request for review on February 23, 2005 (R. 36-38), which rendered the ALJ's decision

a "final decision" for purposes of judicial review.

However, rather than appealing the ALJ's decision to this Court, Claimant protectively filed a second application for DIB benefits on May 20, 2004. (R. 381-84.) She again alleged disability beginning July 19, 2000, and listed similar causes of bipolar disorder, hyperthyroidism, Lyme disease, anxiety and depression. (R. 390.) This second application was also denied initially (R. 358-61) and upon reconsideration (R. 364-66). Claimant once again requested a hearing (R. 367), which took place in front of a different ALJ on May 23, 2006 (R. 658). On August 24, 2006, the second ALJ issued a decision partially granting and partially denying Claimant's second application. (R. 19-31.) Namely, the second ALJ found that Claimant was disabled for a closed period from July 19, 2000 until March 24, 2003, but not thereafter. *Id.* However, because this closed period of disability ended more than 12 months before the date of Claimant's second application, no DIB benefits were ever paid. (R. 12.)

Claimant requested review of the second ALJ's partial denial of her second application (R. 15), and on July 28, 2009, the Council issued a notice of proposed decision (R. 622-25). In this notice, the Council proposed to adopt the second ALJ's statements regarding the law, the issues in the case, and the evidentiary facts, but to *not* adopt the second ALJ's conclusion that Claimant was disabled from July 19, 2000 through March 24, 2003. (R. 11.) Rather, the Council proposed to find that Claimant was not disabled at any point prior to December 31, 2005, her date last insured ("DLI"). (R. 12-13.) The Council based this proposition on its view that the first ALJ's denial of benefits was final and binding through that decision's issue date of March 11, 2004, and that accordingly, *res judicata* applied to bar Claimant's claim of disability up until that date. (R. 12.) Going forward, the Council agreed with the second ALJ's reasoning and conclusion that Claimant was no longer disabled from March 12, 2004 through December 31, 2005. (R. 13.) On August 27,

2

2009, after receiving comments from Claimant's counsel, the Council issued a final decision adopting the outcome outlined in its proposed decision. (R. 11-14.) Accordingly, on October 28, 2009, Claimant commenced the instant action pursuant to 42 U.S.C. § 405(g).

On appeal, Claimant argues that the Commissioner (1) erred in applying *res judicata*; (2) did not show that a medical improvement had taken place by substantial evidence; (3) did not give adequate consideration to the medical evidence provided by Claimant's treating physician or the medical expert; (4) erred in conducting an assessment of Claimant's RFC; and (5) failed to accurately evaluate Claimant's credibility.

## DISCUSSION

### I.    Social Security Framework

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. § 404.1520. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the Commissioner must determine whether the claimant has a severe impairment or combination of impairments which significantly limit his or her ability to perform basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three the Commissioner determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listings"), as listed in 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled *per se*. If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot

3

perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work.

If, at any point during this process, the Commissioner determines that the claimant has been disabled, then a determination as to whether the disability continues through the date of the decision must also be made. In making this determination, the Commissioner follows a secondary sequential eight-step evaluation process, which overlaps considerably with the five-step process outlined above. 20 C.F.R. § 404.1594. Essentially, during the course of this evaluation, the Commissioner determines whether medical improvement has occurred which enables the claimant to perform either past relevant work or other substantial gainful work.

## II.    Standard of Review

In order for a district court to exercise its jurisdiction to review a decision by the Commissioner, that decision must be "final." 42 U.S.C. § 405(g) ("Any individual, after any *final decision* of the Commissioner . . . made after a hearing to which [the claimant] was a party . . . may obtain a review of such decision by a civil action . . .") (emphasis added). To obtain such a final decision, the claimant must first proceed through an administrative review process to exhaust his or her remedies. 20 C.F.R. § 404.900(a). This process includes four steps: (1) initial determination; (2) reconsideration; (3) hearing before an ALJ; and (4) review by the Council. *Id.*

Once jurisdiction has been established, the scope of judicial review of a final decision regarding disability benefits under the Social Security Act is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls v. Barnhart*, 296 F.3d 287, 290

4

(4th Cir. 2002); *see also* 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296 F.3d at 290. Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the Commissioner analyzed all of the relevant evidence and whether the Commissioner sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III.     The May 23, 2006 Administrative Hearing

### A.     Claimant's testimony at the administrative hearing

Claimant testified to the following at the May 23, 2006 administrative hearing held in conjunction with her second application for DIB benefits. (R. 658-678.) At the time of the hearing, she was 33 years old and living in Zebulon, North Carolina. (R. 662.) She was a high school graduate and not currently working. (R. 662-63.) Claimant's last employer had been the United States Air Force, where she worked in a secretarial job. (R. 663.) She left the Air Force in July of 2000 on a medical discharge after serving for a little over seven years. *Id.* Prior to her discharge, Claimant had been hospitalized on two different occasions for bipolar disorder. *Id.* In the past, Claimant had also worked as a waitress at Burger King and at Cantina East. (R. 663-65.)

Claimant testified to a number of conditions that impeded her ability to work. Since leaving the Air Force, Claimant reported having been under psychiatric treatment and receiving diagnoses for post-traumatic stress disorder ("PTSD"), depression with anxiety, and bipolar disorder. (R. 666.)

5

She testified that her PTSD was a result of a physically abusive relationship with her ex-husband and "the anxiety of having to go into the military and work." *Id.* She testified that her bipolar disorder caused mood swings, with rapid cycling highs and lows lasting anywhere from an hour to two or three days. (R. 667.) During the highs, she did a lot of housework, was anxious, and had trouble sleeping. *Id.* During the lows, she wanted to be left alone, cried a lot, and slept or stayed in her room. (R. 668.)

Claimant testified that, at the time of the hearing, she generally was spending her time at home with her five dogs. (R. 669.) On days when she felt well enough, she would try to go outside. (R. 668.) Her current husband, a police officer, would have some of his friends from Wake County drive by and check on her when she was outside. *Id.* However, she testified that knowing that officers were outside her house made her feel paranoid and not want to go outside. *Id.* Claimant also testified that she would try to do the housework, especially the laundry, and help with her children and the dogs. (R. 668, 674-75.) However, her husband would have to help her a lot with these tasks. *Id.* In addition, Claimant's mother would take her grocery shopping sometimes. (R. 669.) Claimant also testified that she took a nap every morning and every afternoon, because she had trouble sleeping through the night. *Id.* Claimant would go to church on occasion and to visit her husband's family in New York state approximately once per year. (R. 675-76.) She sometimes tried to cook for her family but would do things like burn herself while attempting to do so. (R. 677.)

At the time of the hearing, Claimant was taking 1.5 milligrams of Clonazepam, 300 milligrams of Lithium three times a day, and 20 milligrams of Fluoxetine. (R. 670.) These medications had been stable for a period of about three years. *Id.*

6

Claimant testified that she tended to be "really argumentative with supervisors and people that are in a higher position" than her. (R. 665.) Claimant also indicated that she did not feel like she had the ability to work with people to whom she wasn't related and that she wasn't able to take orders very well. *Id.* In addition, Claimant testified that she was not capable of showing up on time for a lot of things. (R. 670.) She also cited problems concentrating when she was on a bipolar low. (R. 671.) Finally, Claimant testified that her condition had not gotten any better or worse since she left the Air Force, attributing this to the fact that she had had "no outside factors other than [her] family to aggravate [her] condition." *Id.*

## B. Medical expert's testimony at the administrative hearing

Dr. Nathan Strahl, a psychiatrist, questioned Claimant during the hearing and testified as to his opinion of Claimant's medical status. (R. 678-691.) Dr. Strahl testified that Claimant had a number of mental health issues relating to a history of bipolar disorder, PTSD, and a combination of the two which brought on at times clinical depression, panic attacks and anxiety. (R. 684.) He testified that, around the year 2000, "things really hit the fan for her resulting in several hospitalizations," and that "at that time, she was not capable or not functional in terms of being able to get on with her life and do things that would be of value." *Id.* Therefore, he concluded that between the years 2000 and 2003, there was adequate information to establish a closed period of disability. (R. 684-85.) Specifically, Dr. Strahl testified that he believed Claimant had met Listings 12.04 (bipolar disorder) and 12.06 (anxiety) during this period. (R. 686.)

However, Dr. Strahl also testified that over the past two or three years, Claimant's medical record had shown "relative stability," despite some medication shifts and missed appointments. (R.

7

684.) Though he believed she would need to be in an environment where she had minimal contact with a lot of other people and answered to only one person, he suggested that with the proper job opportunity, beginning in 2003 she "probably could have transferred her energies from her home life to her work life." (R. 685.) Accordingly, Dr. Strahl testified to his belief that Claimant no longer met a Listing after that time. *Id.*

Dr. Strahl did acknowledge that the records available concerning Claimant's psychiatric treatment in recent years had been "sketchy." (R. 688.) Similarly, he expressed some concern about the medications she was currently prescribed. (R. 689-91.) In addition, during Dr. Strahl's testimony, it also became clear that Claimant did not feel like she was getting good or even adequate psychiatric treatment from the VA. *Id.*

## C.     Vocational expert's testimony at the administrative hearing

Dr. Stephen Carpenter, a vocational expert ("VE"), also testified at the administrative hearing. (R. 691-99.) Dr. Carpenter had not been present in the room when Claimant testified as to her work experience. (R. 692.) However, her file had been made available to him and the second ALJ summarized the salient facts before Dr. Carpenter began his testimony. (R. 693-94.)

Dr. Carpenter stated that Claimant had performed past work (1) as a clerk-typist, clerical industry, DOT code 203.362-010, strength level sedentary, SVP 4, semi-skilled; and (2) as a waitress, informal, hotel and restaurant industry, DOT code 311.477-030, strength level light, SVP 3, low level semi-skilled. (R. 694-95.) The second ALJ then posed the following hypothetical to Dr. Carpenter:

> What if I were to assume a hypothetical person of the same age, education and past work of the Claimant and what if I were further to assume that this individual has no

8

significant exertional impairments but due to non-exertional impairments would have to work in the realm–in a job that entailed simple, repetitive tasks in an environment where she wouldn't have to deal with a lot of people. She wouldn't deal with the public. She would have a situation where she would have one person to answer to in terms of how she was doing her job and she was–would be able to work on her own essentially. Assuming that type of a profile, would there be jobs in your opinion that a person could perform?

(R. 695.) Dr. Carpenter responded that "as long as she could work independently" and "be able to

communicate with her supervisor on at least an occasional basis," there would be jobs that such a

person could perform. *Id.* For example, Dr. Carpenter suggested the following potential jobs: (1)

cleaner/housekeeping, DOT code 323.687-014, strength level light, SVP 2, unskilled; (2) laundry

worker, any industry, DOT code 361.685-017, strength level medium, SVP 2, unskilled; and (3)

laborer, stores, any industry, DOT code 922.687-058, strength level medium, unskilled. (R. 695-96.)

Dr. Carpenter indicated that all three of these potential jobs were being performed by anywhere from

5,000 to "multiple thousands" of workers in North Carolina and nationally by more than half a

million workers. (R. 696.)

The second ALJ next asked Dr. Carpenter to assume that Claimant's testimony was

completely credible and that she had all the impairments to which she had testified as severely as she

had indicated. *Id.* Dr. Carpenter answered that he believed that she "most likely would frequently

miss work, would most likely be absent at least 20 percent of the workweek which would eliminate

her ability to perform attendance demands and–that are required by even unskilled jobs and her

inability to relate to anyone essentially would eliminate her ability to accept criticism and accept any

type of performance appraisal from her supervisor." (R. 697.) Dr. Carpenter also stated that he

believed it to be unlikely that Claimant would be able to maintain any type of consistent work. *Id.*

9

## IV. The Second ALJ's Findings

The second ALJ issued a decision regarding Claimant's second application for DIB benefits on August 31, 2006. (R. 16-31.) At the outset, the second ALJ stated that Claimant's first application for disability benefits was being reopened and revised.[1] (R. 20.) Thereafter, the second ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520. (R. 24-31.) At step one, the second ALJ found that Claimant had not engaged in substantial gainful activity since July 19, 2000, the alleged onset date. (R. 24.) At step two, the second ALJ found that, since the alleged onset date of her disability, Claimant had suffered from the severe impairments of bipolar disorder and PTSD. *Id.* At step three, the second ALJ determined that Claimant's impairments had met the criteria of two Listings, namely sections 12.04 and 12.06 as listed in 20 C.F.R. § 404, Subpart P, App. 1, from July 19, 2000 until March 24, 2003. *Id.* In so doing, the second ALJ relied heavily upon the testimony given by Dr. Strahl at the May 23, 2006 hearing. (R. 25.) Accordingly, the second ALJ concluded that Claimant was under a disability, as defined by the Social Security Act, from July 19, 2000 until March 24, 2003. (R. 26.)

The second ALJ next proceeded through the eight-step sequential evaluation process as set forth in 20 C.F.R. § 404.1594 in order to determine whether Claimant's disability had continued through the date of the decision.[2] The second ALJ found that medical improvement had occurred

---

[1] The ALJ referred to Claimant's "prior Title II application filed on May 20, 2004." However, it seems clear to the Court that he, in fact, was referencing Claimant's prior application for DIB benefits filed on December 14, 2001, as it is the *current* application which was filed on May 20, 2004.

[2] The Court notes that the second ALJ did not lay out all eight steps of the 20 C.F.R. § 404.1594 medical improvement evaluation process in sequential order. However, the reasoning, language, and citations in the opinion indicate that all relevant steps were appropriately considered.

10

as of March 25, 2003, after which time Claimant did not have an impairment or combination of impairments which met or equaled a Listing. (R. 26-28.) The second ALJ assessed Claimant's RFC and determined that, beginning on March 25, 2003, Claimant had the RFC to perform work at any exertional level with the following restrictions: "an inability to deal with the public; the necessity of having the option to work on her own; and, having only one person to whom she reports." (R. 28-29.) The second ALJ did conclude that, beginning on March 25, 2003, Claimant was unable to perform her past relevant work as a clerk-typist or informal waitress. (R. 29-30.) However, the second ALJ determined that, considering Claimant's age, education, work experience, and RFC, Claimant *had* been able to perform a significant number of jobs in the national economy since March 25, 2003. (R. 30.) As a result, the second ALJ concluded that medical improvement had occurred affecting Claimant's ability to work and that Claimant's disability had ended beginning on March 25, 2003. (R. 31.)

## V.    The Council's Decision

The Council issued its final decision on August 27, 2009. (R. 9-14.) In it, the Council adopted the second ALJ's "statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings, the issues in the case, and the evidentiary facts," but did *not* adopt the second ALJ's findings or conclusions regarding whether Claimant was disabled from July 19, 2000 through March 24, 2003. (R. 11.) The Council also noted that Claimant's representative, during the comment period, had argued that Claimant's first hearing decision, dated March 11, 2004, should be reopened and Claimant should be found disabled, but did *not* request that Claimant be found disabled after that closed period. (R. 12.)

11

### A. Decision regarding the period from July 19, 2000 through March 11, 2004

The Council found that the prior hearing decision dated March 11, 2004 was final and binding. (R. 12.) In so doing, the Council noted that the only new evidence in the second claim which related to the 2000-2003 time period was the testimony of Dr. Strahl, the medical expert. *Id.* The Council recognized that the second ALJ had given great weight to Dr. Strahl's testimony and used it as the primary basis for finding Claimant was disabled for a closed period. *Id.* However, the Council also believed that Dr. Strahl did not refer to any specific medical evidence in support of his opinion, and that his opinion was "inconsistent with the medical and nonmedical evidence of record." *Id.* Therefore, the Council concluded that Dr. Strahl's testimony was not supported by the evidence and did not provide a basis for the second ALJ to reopen the prior hearing decision. *Id.*

Rather, the Council found that the facts and evidence before the second ALJ were essentially the same as those that had come before the first ALJ. *Id.* The Council found that nothing in the record of Claimant's second application supported deviation from the first ALJ's assessment that Claimant was "capable of performing simple, routine, repetitive tasks with only occasional interaction with the public and co-workers." *Id.* Accordingly, the Council dismissed Claimant's request for hearing for all times prior to May 11, 2004 under the doctrine of *res judicata. Id.*

### B. Decision regarding the period from March 12, 2004 through December 31, 2005

The Council adopted the ALJ's rationale and findings at each step of the evaluation process regarding the period from March 12, 2004 through December 31, 2005. (R. 13.) In particular, the Council found that Claimant's "nonexertional limitations did not prevent her from performing jobs existing in significant numbers in the national economy." *Id.* Accordingly, the Council adopted the

second ALJ's conclusion that Claimant was not disabled from March 12, 2004 through December 31, 2005, her DLI. *Id.*

## VI.    Claimant's Arguments

Claimant's first argument, that the Commissioner erred in applying *res judicata*, is clearly applicably only up to and including the date of the first ALJ's decision, March 11, 2004. The remainder of her arguments, however, seem to relate more to the possibility that the second ALJ erred in finding her disability had ended on March 25, 2003. Accordingly, the Court will address Claimant's *res judicata* argument as it applies to the period prior to the first ALJ's decision and the remainder of Claimant's arguments as they may relate to any time thereafter.

### A.    The Commissioner erred in applying *res judicata*

Claimant primarily contends that the Commissioner erred in finding that the doctrine of *res judicata* applies to bar Claimant's second application for DIB benefits. The Commissioner argues in response that this Court lacks jurisdiction to review the Council's decision to not reopen Claimant's application.

The Commissioner has the power to deny any disability claim on the basis that it has earlier been denied on the merits by another final administrative decision. *Easley v. Finch*, 431 F.2d 1351, 1353 (4th Cir. 1970). Under the doctrine of *res judicata*, such an earlier decision may be given preclusive effect if any subsequent application for benefits is filed which deals with identical facts and issues. *McGowen v. Harris*, 666 F.2d 60, 65 (4th Cir. 1981). However, even when the second claim is identical, the Commissioner may choose instead to reopen the earlier claim and consider it on the merits, within a year for any reason or within four years for good cause shown. 20 C.F.R. §§

13

404.987, 404.988. The Commissioner may find good cause to reopen if new and material evidence is furnished. 20 C.F.R. § 404.989.

The Supreme Court has held that, as a general rule, a district court lacks jurisdiction to review a refusal by the Commissioner to reopen a prior determination because it is not a "final" decision made "after a hearing." *Califano v. Sanders*, 430 U.S. 99, 108 (1977); *see also* 42 U.S.C. § 405(g) ("Any individual, after any *final decision* of the Commissioner . . . made *after a hearing* to which [the claimant] was a party . . . may obtain a review of such decision by a civil action . . .") (emphasis added). Accordingly, the Fourth Circuit has emphasized that a district court generally lacks jurisdiction to review a decision to apply *res judicata* as a bar to a subsequent claim instead of reopening. *McGowen*, 666 F.2d at 65.

However, two exceptions apply. First, the district court may review the Commissioner's decision not to reopen the claim if the claimant has raised a constitutional objection to the Commissioner's application of *res judicata*. *Sanders*, 430 U.S. at 109. Second, the district court may review the decision if the Commissioner, before deciding to apply the doctrine of *res judicata*, actually reconsidered the subsequent claim on the merits and thereby constructively reopened it. *McGowen*, 666 F.3d at 65-66. Here, Claimant has not raised any claim of constitutional violation. Accordingly the Court considers only the possibility that the Commissioner constructively reopened her claim on the merits.

Claimant argues that, in her case, her second claim was reconsidered on the merits by the second ALJ and that thus this Court may review the Council's decision under the constructive reopening exception. In so doing, Claimant points to language in *McGowen* which suggests that

14

jurisdiction to review exists whenever the initial determination has been reopened "at any administrative level." 666 F.3d at 65.

The Court recognizes that the second ALJ in the instant case did explicitly state that he was reopening the initial determination for reconsideration. However, it is not the second ALJ's decision that is the final decision of the Commissioner for purposes of judicial review, but the decision of the Council. Though the language in *McGowen* was admittedly somewhat unclear, the Fourth Circuit has subsequently clarified its scope, by stating that, in fact, "a district court has jurisdiction to review only [the Commissioner]'s final decision, and when as here, that is the decision of the Appeals Council, it is to that decision the court must look to determine whether under *McGowen*'s rule it involved an actual reopening of an earlier decision." *Hall v. Chater*, 52 F.3d 518, 521 (4th Cir. 1995). Accordingly, it is of no import whether the second ALJ in the instant case did or did not either explicitly or constructively reopen Claimant's claim for benefits. The dispositive question is whether the Council did. Though Claimant does not explicitly argue that the Council constructively reopened Claimant's initial application, the Court will consider that issue as well in the interest of completeness.

The Council's opinion in this case made clear that it was formally resting its decision to deny benefits for the period from July 19, 2000 to March 11, 2004 on the doctrine of *res judicata*. However, the Court recognizes that the Council did devote the bulk of two paragraphs to a discussion of whether Dr. Strahl's testimony constituted new and material evidence sufficient to reopen Claimant's prior application. Accordingly, the Court will consider the possibility that, in so doing, the Council constructively reopened Claimant's prior application.

15

If the Commissioner, though "purporting to deny reopening on grounds of administrative res judicata, actually reopened the initial determination for reconsideration on the merits," the district court may review this decision. *Hall*, 52 F.3d at 520. However, when evaluating whether to reopen a claim, the Commissioner is entitled to "make a threshold inquiry into the newly submitted evidence" and this will not constitute considering the original case on the merits. *Butler v. Astrue*, No. 7:09-CV-55-FL, 2009 WL 3648277, at *4 (E.D.N.C. Nov. 3, 2009). This is designed to give the Commissioner "some leeway in making a decision whether to reopen, so that it may 'in fairness look far enough into the proffered factual and legal support to determine whether it is the same claim.'" *Hall*, 52 F.3d at 521 (quoting *McGowen*, 666 F.2d at 67). When the threshold inquiry is "followed by a specific conclusion that the claim should be denied on *res judicata* grounds, the threshold inquiry into the nature of the evidence should not be read as a reopening of this claim on the merits." *McGowen*, 666 F.2d at 68.

Here, the Council noted in its opinion that the only new evidence that could conceivably support a reopening of Claimant's prior application was the testimony of Dr. Strahl. (R. 12.) The Council briefly summarized his testimony before concluding that it was "not supported by the evidence and does not provide a basis to change the prior hearing decision." *Id.* Instead, the Council found that "the record contains the essentially same medical evidence and material facts as were considered by the Administrative Law Judge in the hearing decision dated March 11, 2004." *Id.* The Council went on to briefly summarize the first ALJ's findings before explicitly concluding that Claimant's claim for the period through March 11, 2004 should be dismissed under *res judicata*. *Id.*

16

The Court finds that the actions of the Council constituted the acceptable threshold inquiry contemplated in *Hall*, *McGowen*, and *Butler*. In fact, the facts of the instant case are significantly similar to those in both *Butler* and *Hall*. In *Butler*, the Council had compared newly presented evidence to that which had been presented in a prior hearing and determined that the proffers were essentially the same. 2009 WL 3648277, at *4. Specifically, the Council had described medical evidence that had been submitted prior to the first determination and concluded that it was "not material for the purpose of reopening" the original claim. *Id.* Accordingly, Chief Judge Flanagan found that "the Commissioner's recitation and description of the newly submitted evidence did not amount to a constructive reopening of plaintiff's claim [because] [t]he Commissioner made only a threshold inquiry into the proffered evidence as to determine whether the evidence was new and material." *Id.* Similarly, in *Hall*, the Fourth Circuit found that the Council's reversal of a second ALJ's decision to explicitly reopen an initial determination was not subject to judicial review. 52 F.3d at 520-21.[3]

Accordingly, because this Court lacks jurisdiction to review the Council's decision to reverse the second ALJ's reopening of Claimant's first application, the Court does not reach Claimant's argument that the Commissioner erred in applying *res judicata*.

**B.    The Commissioner did not show that medical improvement occurred**

Claimant next contends that the Commissioner did not show, by substantial evidence, that medical improvement had taken place in order to support termination of benefits. The Commissioner argues in response that the medical improvement standard is not pertinent in this case

---

[3]At least one other Circuit has also reached the same result as to judicial review when the Council determined that a second ALJ improperly reopened an initial application. *Johnson v. Sullivan*, 936 F.2d 974, 976 (7th Cir. 1991).

because it only applies after a claimant has been awarded benefits in a final agency decision and the agency later conducts a continuing disability review.

The Court notes that the Commissioner is correct that the "medical improvement" standard, as that term commonly is used, applies only in the context of a continuing disability review in a "cessation of benefits" case.[4] However, the Court is able to recognize, from the citations accompanying Claimant's argument, that it is likely she was instead referencing the eight-step sequential analysis that the Commissioner must follow if a claimant is found disabled at any point in the process in order to determine if the disability continues through the date of the decision. *See* 20 CFR § 404.1594. Therefore, the Court interprets Claimant's argument to be an objection to the second ALJ's determination that her disability ended as of March 25, 2003.

However, as discussed in Section VI.A, *supra*, this Court lacks jurisdiction to review the Council's decision that *res judicata* barred the second ALJ's reopening of Claimant's first application. As a result, the Council's decision stands, and nullifies the second ALJ's finding of disability for the closed period from July 19, 2000 through March 24, 2003. Therefore, because it is only appropriately applied *after* a disability has been found to exist, any evaluation of the second ALJ's application of the 20 C.F.R. § 404.1594 eight-step evaluation is now moot.

To the extent that Claimant's medical improvement argument can also be interpreted to request a more general review of the second ALJ's evaluation of the period from March 12, 2004 until December 31, 2005, the Court will consider her objections in that context. Claimant appears

---

[4] Claimant never received a "final" decision awarding benefits. Though the second ALJ found that she had been disabled for a closed period, the Council subsequently rejected that determination and as such, the final decision that Claimant received was that she was *not* disabled.

to rests her argument on two propositions: First, she argues that the Council failed to appropriately compare the "prior and current medical evidence" to determine if there had been medical improvement. Second, she argues that Dr. Strahl's testimony showed that there was no medical improvement.

Regarding Claimant's first argument, she makes a similar one in the context of her RFC argument which the Court finds unconvincing. *See* Section VI.D, *infra*. Regarding Claimant's second argument, Dr. Strahl testified that Claimant *had* in fact shown medical improvement to the point where she no longer either met a Listing or was disabled in some other way. (R. 685.)

Accordingly, the Court finds Claimant's argument that the Commissioner did not adequately show medical improvement to be without merit.

## C. The Commissioner did not give adequate consideration to medical evidence

Claimant next contends that the Commissioner did not give adequate consideration to medical evidence provided by her treating physician as well as Dr. Strahl. The Commissioner argues in response that there was no failure to give controlling weight to an opinion from either physician.

The thrust behind Claimant's arguments on this issue is somewhat unclear. Though she cites the "treating physician's rule," the Court agrees with the Commissioner's observations that Claimant has not identified the "treating physician" she is referring to and that it is impossible to discern from the record a physician whose opinion favored Claimant that was overlooked by the second ALJ. Furthermore, while Claimant also claims that the second ALJ ignored the opinion of Dr. Strahl, it is abundantly clear from the second ALJ's opinion that, in fact, Dr. Strahl's testimony was the

19

controlling evidence that led to a finding that Claimant had been under a disability for even the closed period.

Accordingly, the Court finds Claimant's argument that the Commissioner did not give adequate consideration to medical evidence to be without merit.

## D.    The Commissioner erred in conducting an assessment of Claimant's RFC

Claimant next contends that the second ALJ's assessment that Claimant retained the RFC to perform work was not supported by substantial evidence. The Commissioner argues in response that the second ALJ's summary of the evidence indicates otherwise and was adopted by the Council.

The second ALJ determined that, after March 25, 2003, Claimant had the RFC to perform work at any exertional level with the following restrictions: "an inability to deal with the public; the necessity of having the option to work on her own; and, having only one person to whom she reports." (R. 28.) In making this determination, the second ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with objective medical evidence" as well as opinion evidence. (R. 29.) Specifically, the second ALJ found that, though Claimant's medically determinable impairments could reasonably be expected to produce the symptoms of which she complained, her statements about the "intensity, persistence and limiting effects" of the symptoms were not entirely credible for the period after March 25, 2003. *Id.* The second ALJ also accorded weight to Dr. Strahl's testimony that Claimant had been stable, no longer disabled, and able to work with some accommodations after that time. *Id.*

The Commissioner must assess a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3). The Court's role is not to weigh the evidence, but only

20

to determine whether the Commissioner's decision rests upon substantial evidence. *Walls*, 296 F.3d at 290.

Claimant alleges several errors that were made by the second ALJ in the course of the RFC determination. First, she argues that the second ALJ did not cite appropriate medical evidence to support his opinion. Second, Claimant argues that, because this is a cessation of benefits case, the second ALJ was required to determine what symptoms are now absent that were present when there was a disability. Finally, Claimant argues that the second ALJ discounted Dr. Strahl's opinion that she was still unable to work.

Regarding Claimant's first argument, the record indicates that the second ALJ did in fact consider medical evidence in determining both Claimant's RFC and the modifications appropriate to enable her to perform a significant range of work. The second ALJ engaged in a detailed evaluation of all the medical evidence in the course of his determination that Claimant *was* disabled from July 19, 2000 until March 24, 2003. (R. 24-25.) Thereafter, in determining that the disability had ended on that date, the second ALJ made findings that several symptoms which had contributed to the closed period of disability had notably improved. Among other evidence, the second ALJ pointed to treatment records which revealed that Claimant had not had a manic episode in over 16 months, had stopped using several medications, and had reported herself that she was feeling better. (R. 26.) Accordingly, the second ALJ concluded that the signs and symptoms of Claimant's bipolar disorder and PTSD had been reduced. *Id.* In addition, the ALJ accorded significant weight to the medical opinion of Dr. Strahl that Claimant was able to perform work beginning on March 25, 2003. (R. 29.) Once again, the Court's role is not to weigh the evidence, but only to determine whether the Commissioner's decision rests upon substantial evidence. *Walls*, 296 F.3d at 290. A review of

21

the record leads the Court to conclude that the second ALJ did in fact cite appropriate medical evidence to support his opinion.

Regarding Claimant's second argument, the Court notes that, as stated in Section VI.B, *supra*, Claimant errs in her categorization of this as a "cessation of benefits" case. However, even if that standard applied, the second ALJ clearly did consider what symptoms were absent after March 25, 2003 that had been present before, as discussed above in reference to Claimant's first argument.

Regarding Claimant's third and final argument, the Court is unable to find evidence anywhere in the record that Dr. Strahl said, at any time, that Claimant was *unable* to work after March 25, 2003. In fact, he testified to exactly the opposite. (R. 685.) Therefore, the Court is unable to evaluate Claimant's third argument with any specificity.

Accordingly, because substantial evidence supported the second ALJ's determination of Claimant's RFC, the Court finds Claimant's argument that the second ALJ erred in conducting an assessment of her RFC to be without merit.

**E.     The Commissioner failed to accurately evaluate Claimant's credibility**

Finally, Claimant contends that the Commissioner failed to accurately evaluate her credibility. The Commissioner argues in response that the second ALJ in fact found Claimant's credibility to be undermined by the improvement in her condition.

At the outset, the Court notes that Claimant does not make any actual *argument* as to how the Commissioner failed to accurately assess her credibility. Rather, she simply states the standard for determining credibility without further explanation. However, the Court will afford Claimant

the benefit of the doubt and assume that she intended to argue that the second ALJ somehow erred in his application of this standard.

In assessing credibility, the Commissioner must follow a two-step process. First the Commissioner must determine whether the claimant's medically determinable impairments could reasonably cause the alleged symptoms. *Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996). Next, the Commissioner must evaluate the evidence regarding those symptoms. *Id.* at 595. The Social Security rulings require that a decision "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Here, the second ALJ explicitly stated that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [her] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible beginning on March 25, 2003." (R. 29.) The second ALJ then noted that Claimant had testified herself that she was in relatively good health, walked her dogs, worked around the house, took care of her children, was sleeping well, and had stopped using some medication. *Id.* The second ALJ also considered Dr. Strahl's testimony that Claimant was no longer disabled based on her stable condition. *Id.* Therefore, the second ALJ concluded that Claimant's assertions that she was still disabled were not supported by her own conflicting testimony and the testimony of Dr. Strahl. *Id.*

23

Accordingly, the Court finds that the Commissioner accurately evaluated Claimant's credibility and did not err in the determination that she was not entirely credible from March 25, 2003 onwards.

## CONCLUSION

The undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings [DE-14] be **DENIED** and that the Commissioner's motion for judgment on the pleadings [DE-20] be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 28th day of January, 2011.

DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE

24